**Case Nos. 22-55209 (L), 22-55247**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

NETLIST INC.,
a Delaware corporation,
*Plaintiff-Appellee,*

v.

SAMSUNG ELECTRONICS CO., LTD.,
a Korean corporation,
*Defendant-Appellant.*

*Appeal from the United States District Court for the Central District of California (Santa Ana),
Case No. 8:20-cv-00993-MCS-ADS · Honorable Mark C. Scarsi, District Judge*

## THIRD BRIEF ON CROSS-APPEAL
## [APPELLANT'S RESPONSE AND REPLY BRIEF]
## [REDACTED – PUBLIC VERSION]

ANTON METLITSKY
BRUCE C. PETTIG
KEVIN J. KOAI
O'MELVENY & MYERS, LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
ametlitsky@omm.com
bpettig@omm.com
kkoai@omm.com

MICHAEL G. YODER
MARC F. FEINSTEIN
O'MELVENY & MYERS, LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
myoder@omm.com
mfeinstein@omm.com

*Attorneys for Appellant Samsung Electronics Co., Ltd.*

 

# TABLE OF CONTENTS

**Page**

REPLY IN SUPPORT OF SAMSUNG'S APPEAL.................................. 1

ARGUMENT ............................................................................. 1

I.    Samsung Is Entitled To Judgment On Netlist's Supply-
Obligation Claim. ............................................................ 1

    A.    Samsung Did Not Breach Section 6.2.................................. 1

        1.    Samsung's Supply Obligation In Section 6.2 Is
Unambiguously Limited To The NVDIMM-P
Joint-Development Project............................................. 1

            a.    Netlist improperly relies on a negative
inference lacking any logical basis. .................... 2

            b.    Read as a whole, the JDLA unambiguously
limits section 6.2 to the NVDIMM-P joint-
development project. ....................................... 5

            c.    Netlist's construction of section 6.2 conflicts
with what ordinary businesspeople would
reasonably expect.......................................... 9

        2.    Even If Section 6.2 Were Ambiguous, The
Extrinsic Evidence Overwhelmingly Supports
Samsung's Reading. .................................................. 11

            a.    Negotiation history and MOU .......................... 11

            b.    Netlist's contemporaneous understanding........ 17

            c.    Course of conduct ......................................... 20

            d.    Samsung's after-the-fact internal
communications ........................................... 22

            e.    Extrinsic evidence of the supply obligation's
purpose ...................................................... 23

# TABLE OF CONTENTS
(continued)

3. If The Court Concludes That The JDLA Is Ambiguous And That The Extrinsic Evidence Does Not Resolve The Ambiguity As A Matter Of Law, It Should Remand For Trial. ........................... 27

B. The Jury's Finding That No Damage Resulted From Any Violation of Section 6.2 Independently Requires Judgment for Samsung. ....................................... 28

II. Samsung Is Entitled To Judgment On Netlist's Tax-Withholding Claim. ................................................ 34

A. Samsung Did Not Violate Section 3.1 By Reasonably Withholding Taxes. ................................................ 34

B. Netlist's Failure To Prove Damages For Any Breach of Section 3.1 Independently Requires Judgment for Samsung. ................................................ 37

III. Samsung Is Entitled To Judgment, Or At Least A Trial, On Netlist's Declaratory-Judgment Claim. ........................................ 37

A. There Is At Least A Fact Question About Whether Any Breach Was Material. ........................................ 38

1. Whether Any Breach Of Section 6.2 Was Material Is At Least A Triable Fact Question. ......................... 39

2. Whether Any Breach Of Section 3.1 Was Material Is At Least A Triable Fact Question. ......................... 47

B. The District Court Erred In Rejecting Samsung's Waiver Defense To Netlist's Declaratory-Judgment Claim. ................................................ 51

IV. The District Court Erred In Preventing Samsung From Raising Its Affirmative Defenses. ................................................ 55

A. The District Court Erred In Deeming Samsung's Waiver, Acquiescence, And Estoppel Defenses Waived. ...... 55

# TABLE OF CONTENTS
(continued)

**Page**

    B.    The District Court Erred In Precluding Samsung From Raising Its Election-Of-Remedies Defense..........................61

RESPONSE TO NETLIST'S CROSS-APPEAL.....................................63

COUNTER-STATEMENT OF THE ISSUES........................................63

COUNTER-STATEMENT OF FACTS RELATING TO CROSS-APPEAL.........................................................................................64

SUMMARY OF ARGUMENT ON CROSS-APPEAL ...........................64

STANDARD OF REVIEW ON CROSS-APPEAL..................................65

ARGUMENT ON CROSS-APPEAL....................................................65

I.    The Trial Court Correctly Concluded That The PwC Fees Netlist Incurred In Seeking A Tax Refund Are Consequential Damages Precluded By The JDLA. .....................65

II.   Netlist's Contention That It Is Entitled To Prejudgment Interest From The Time Of The Purported Breach Is Contrary To Established New York Precedent. ...........................69

CONCLUSION ...............................................................................71

CERTIFICATE OF COMPLIANCE.....................................................72

CERTIFICATE OF SERVICE...............................................................73

-iii-

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*10-12 W. 107th St. HDFC v. Vilma*,
976 N.Y.S.2d 830 (Civ. Ct. 2013) .......................................................... 41

*67 Wall St. Co. v. Franklin Nat'l Bank*,
37 N.Y.2d 245 (1975) ........................................................... 12, 14, 17

*A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*,
926 F. Supp. 378 (S.D.N.Y. 1996) .......................................................... 67

*Advanced Water Techs. Inc. v. Amiad U.S.A., Inc.*,
2019 WL 4805330 (S.D.N.Y. Sept. 30, 2019) ...................................... 50

*Aero Garage Corp. v. Hirschfeld*,
586 N.Y.S.2d 611 (N.Y. App. Div. 1992) ............................................. 69

*Alberts v. CSTV Networks, Inc.*,
96 A.D.3d 447 (N.Y. App. Div. 2012) .................................................. 41

*Am. Prop. Consultants, Ltd. v. Zamias Servs., Inc.*,
294 A.D.2d 217 (N.Y. App. Div. 2002) ................................................. 27

*Am. Railcar Indus., Inc. v. Gyansys, Inc.*, 2017 WL 11501888
(S.D.N.Y. Nov. 14, 2017), *aff'd*, 764 F. App'x 57
(2d Cir. 2019) ...................................................................................... 67

*ARP Films, Inc. v. Marvel Entertainment Group, Inc.*,
952 F.2d 643 (2d Cir. 1991) ................................................................ 50

*Awards.com v. Kinko's, Inc.*,
42 A.D.3d 178 (N.Y. App. Div. 2007) .................................................. 41

*Barnett v. Schwartz*,
47 A.D.3d 197 (N.Y. App. Div. 2007) .................................................. 70

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*,
361 F. Supp. 2d 283 (S.D.N.Y. 2005) ...................................... 38, 47, 48

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
22 N.Y.3d 799 (2014) .......................................................................... 66

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas*
  *Associates, P.C.*,
  91 N.Y.2d 256 (1998) ....................................................... 70

*Canon Sols. Am., Inc. v. Lucky Games, Inc.*,
  2017 WL 1653563 (S.D.N.Y. May 1, 2017) ......................... 41

*Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship*,
  2 A.D.3d 331 (N.Y. App. Div. 2003) ................................... 27

*City of Elmira v. Larry Walter, Inc.*,
  546 N.Y.S.2d 183 (N.Y. App. Div. 1989) ............................ 68

*Clem v. Lomeli*,
  566 F.3d 1177 (9th Cir. 2009) ........................................... 52

*Cole v. Macklowe*,
  99 A.D.3d 595 (N.Y. App. Div. 2012) .............................. 9, 10

*Comcast of Sacramento I, LLC v. Sacramento Metro. Cable
  Television Comm'n*,
  923 F.3d 1163 (9th Cir. 2019) ........................................... 46

*Congel v. Malfitano*,
  31 N.Y.3d 272 (2018) ...................................................... 69

*Cytec Indus., Inc. v. B.F. Goodrich Co.*,
  232 F. Supp. 2d 821 (S.D. Ohio 2002) ............................... 59

*Daingerfield Island Protective Soc. v. Babbitt*,
  40 F.3d 442 (D.C. Cir. 1994) ............................................ 58

*Diversey Lever, Inc. v. Ecolab, Inc.*,
  191 F.3d 1350 (Fed. Cir. 1999) ..................................... 57, 58

*Doe v. United States*,
  419 F.3d 1058 (9th Cir. 2005) ........................................... 61

*Doner-Hedrick v. N. Y. Inst. of Tech.*,
  874 F. Supp. 2d 227 (S.D.N.Y. 2012) ................................ 43

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*,
2017 WL 3453206 (E.D. Cal. Aug. 11, 2017)...........................57, 58, 59

*Echostar Satellite L.L.C. v. ESPN, Inc.*,
79 A.D.3d 614 (N.Y. App. Div. 2010)....................................................53

*F.T.C. v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997), *as amended* (Apr. 11, 1997) ...............24

*Fairchild v Genesee Patrons Coop. Ins. Co.*,
238 A.D.2d 841 (N.Y. App. Div. 1997)...........................................27, 28

*Faulkner v. Nat'l Geographic Soc.*,
452 F. Supp. 2d 369 (S.D.N.Y. 2006)..............................................20, 24

*Fellion v. Darling*,
14 A.D.3d 904 (N.Y. App. Div. 2005)....................................................29

*Finley v. Atlantic Transp. Co.*,
220 N.Y. 249 (1917) ..............................................................................33

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*,
111 F.3d 284 (2d Cir. 1997) ..................................................................38

*Freund v. Washington Sq. Press*,
34 N.Y.2d 379 (1974) ............................................................................33

*Groves v. Am. Fam. Mut. Ins. Co., S.I.*,
479 F. Supp. 3d 796 (E.D. Wis. Aug. 14, 2020) .............................57, 58

*Hadden v. Consol. Edison Co. of N.Y., Inc.*,
34 N.Y.2d 88 (1974) ........................................................................39, 43

*Hartford Acc. & Indem. Co. v. Wesolowski*,
33 N.Y.2d 169 (1973) ............................................................................28

*Helgar Corp. v. Warner's Features, Inc.*,
222 N.Y. 449 (1918) .........................................................................49, 50

*Hirsch Elec. Co. v. Cmty. Servs.*, Inc.,
145 A.D.2d 603 (N.Y. App. Div. 1988)..................................................33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Holland Loader Co. v. FLSmidth A/S*,
769 F. App'x 40 (2d Cir. 2019) ............................................................ 31

*Hooper Assocs., Ltd. v. AGS Computs., Inc.*,
74 N.Y.2d 487 (1989) ........................................................................... 2

*In re Air Crash Disaster Near Cerritos*,
982 F.2d 1271 (9th Cir. 1992) .............................................................. 65

*In re Mercury Interactive Corp. Sec. Litig.*,
618 F.3d 988 (9th Cir. 2010) ............................................................... 47

*J & J Structures, Inc. v. Callanan Indus., Inc.*,
626 N.Y.S.2d 891 (N.Y. App. Div. 1995) ....................................... 68, 69

*Jafari v. Wally Findlay Galleries*,
741 F. Supp. 64 (S.D.N.Y. 1990) ........................................................ 51

*Kaffaga v. Steinbeck*,
2017 WL 5989039 (C.D. Cal. Aug. 25, 2017) ................................. 57, 58

*Kamco Supply Corp. v. On the Right Track, LLC*,
149 A.D.3d 275 (N.Y. App. Div. 2017) ............................................... 54

*Kellerer v. Allied Prop. & Cas. Ins. Co.*,
689 F. App'x 494 (9th Cir. 2017) .................................................... 62, 63

*Kinney v. Mass. Bonding & Ins. Co.*,
206 N.Y.S. 163 (N.Y. App. Div. 1924) ................................................ 68

*KLS Diversified Master Fund, L.P. v. McDevitt*,
507 F. Supp. 3d 508 (S.D.N.Y. 2020) .................................................. 49

*Kronos, Inc. v. AVX Corp.*,
81 N.Y.2d 90 (1993) ............................................................................ 32

*KST Data, Inc. v. DXC Tech. Co.*,
980 F.3d 709 (9th Cir. 2020) ........................................................... 55, 56

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2005) ................................................................ 20

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Leach v. Bailly,*
57 A.D.3d 1286 (N.Y. App. Div. 2008)................................................70

*Long v. Howard Univ.,*
550 F.3d 21 (D.C. Cir. 2008).....................................................57, 60, 61

*M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.,*
432 F.3d 127 (2d Cir. 2005) .........................................................27

*Manhattan Savs. Inst. v. Gottfried Baking Co.,*
286 N.Y. 398 (1941) ................................................................33

*Marx v. Gen. Revenue Corp.,*
568 U.S. 371 (2013)..................................................................3

*Merch. v. Corizon Health, Inc.,*
993 F.3d 733 (9th Cir. 2021).......................................................55

*Milo & Gabby LLC v. Amazon.com, Inc.,*
693 F. App'x 879 (Fed. Cir. 2017)................................................58

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983).....................................................................45

*Murray Walter, Inc. v. Sarkisian Bros., Inc.,*
183 A.D.2d 140 (N.Y. App. Div. 1992)..........................................20

*N.L.R.B. v. SW Gen., Inc.,*
137 S. Ct. 929 (2017)..................................................................3

*Optima Media Group Ltd. v. Bloomberg L.P.,*
2021 WL 1941878 (S.D.N.Y. May 14, 2021)...................................53

*Pantry, Inc. v. Stop-N-Go Foods, Inc.,*
796 F. Supp. 1164 (S.D. Ind. 1992) .............................................58

*Perry v. McMahan,*
164 A.D.3d 1486 (N.Y. App. Div. 2018)........................................33

*Perry v. McMahan,*
164 A.D.3d 1488 (N.Y. App. Div. 2018)........................................33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*,
   2018 WL 10579873 (S.D.N.Y. Sept. 19, 2018) .....................................44

*PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
   73 F. Supp. 3d 358 (S.D.N.Y. 2014)................................................66, 67

*Process Am., Inc. v. Cynergy Holdings, LLC*,
   839 F.3d 125 (2d Cir. 2016) ........................................................... passim

*Proper v. State Farm Mut. Auto. Ins. Co.*,
   63 A.D.3d 1486 (N.Y. App. Div. 2009)...........................................28, 29

*Raymond Corp. v. National Union Fire Insurance Co.*,
   5 N.Y.3d 157 (2005) .............................................................................35

*Reyelt v. Danzell*,
   533 F.3d 28 (1st Cir. 2008) ..................................................................40

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) .....................................................65, 66, 68

*Simmons v. Navajo Cnty., Ariz.*,
   609 F.3d 1011 (9th Cir. 2010)..............................................................56

*Spodek v. Park Property Dev. Assocs.*,
   96 N.Y.2d 577 (2001) .....................................................................70, 71

*Taub v. Marchesi di Barolo S.p.A.*,
   480 F. App'x 643 (2d Cir. 2012) ..........................................................51

*Taylor v. United States*,
   821 F.2d 1428 (9th Cir. 1987)..............................................................31

*Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co.*,
   851 F.3d 976 (9th Cir. 2017)..........................................................30, 33

*Travellers Int'l AG v. Trans World Airlines, Inc.*,
   722 F. Supp. 1087 (S.D.N.Y. 1989)......................................................54

*United Mine Workers of America 1974 Pension v. Pittston Co.*,
   984 F.2d 469 (D.C. Cir. 1993).............................................................58

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Hernandez-Rodriguez,*
  352 F.3d 1325 (10th Cir. 2003) ............................................................ 46

*United States v. Pallares-Galan,*
  359 F.3d 1088 (9th Cir. 2004) ....................................................... 46, 47

*United States v. Southwell,*
  432 F.3d 1050 (9th Cir. 2005) ....................................................... 56, 57

*Uribe v. Merchants Bank of N.Y.,*
  91 N.Y.2d 336 (1998) ................................................................... 10, 35

*USA Petroleum Co. v. Atl. Richfield Co.,*
  13 F.3d 1276 (9th Cir. 1994) ............................................................. 59

*Viacom Outdoor, Inc. v. Wixon Jewelers, Inc.,*
  906 N.Y.S.2d 776 (N.Y. Sup. Ct. 2009) ........................................... 41

*Wakeman v. Wheeler & Wilson Mfg. Co.,*
  101 N.Y. 205 (1886) ..................................................................... 30, 32

*Westmoreland Coal Co. v. Entech, Inc.,*
  100 N.Y.2d 352 (2003) ............................................................... 1, 2, 5

*Yee v. City of Escondido, Cal.,*
  503 U.S. 519 (1992) ........................................................................... 46

**Rules**

Fed. R. Civ. P. 16(e) ........................................................................... 31

Fed. R. Civ. P. 51(d) ........................................................................... 31

Fed. R. Civ. P. 56(a) ........................................................................... 56

N.Y. CPLR § 5001(b) ..................................................................... 65, 70

**Treatises**

5 Corbin on Contracts § 1001 (1951) ................................................. 32

Restatement (Second) of Contracts § 214(c) ..................................... 14

Restatement (Second) of Contracts § 241 .......................................... 38

<u>REPLY IN SUPPORT OF SAMSUNG'S APPEAL</u>

ARGUMENT

In its opening brief, Samsung demonstrated fundamental errors in the district court's judgment on Netlist's supply-obligation, tax-withholding, and declaratory-judgment claims. Netlist's response fails to address those defects, let alone overcome them. Netlist's silence is telling, and confirms that the district court's judgment on those claims cannot stand.

**I. Samsung Is Entitled To Judgment On Netlist's Supply-Obligation Claim.**

**A. Samsung Did Not Breach Section 6.2.**

1. *Samsung's Supply Obligation In Section 6.2 Is Unambiguously Limited To The NVDIMM-P Joint-Development Project.*

Under fundamental principles of New York contract law, Samsung's supply obligation in section 6.2 of the JDLA is unambiguously limited to the parties' NVDIMM-P joint-development project. Samsung Opening Br. ("OB") 24-30. While Netlist attempts to distinguish the many cases cited by Samsung on their facts, Netlist Response Br. ("RB") 19-20, Netlist does not dispute the basic contract principle: Courts must read the contract "as a whole, and every part will be interpreted with reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.*, 100

1

N.Y.2d 352, 358 (2003). In doing so, courts must discern "the apparent purpose of the parties," construing the contract's words "to achieve th[at] apparent purpose." *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 74 N.Y.2d 487, 491 (1989).

Here, those interpretive rules compel the conclusion that Samsung's supply obligation in section 6.2 is limited to the NVDIMM-P joint-development project. Netlist, however, improperly relies on an illogical negative inference to argue that Samsung's obligation to supply NAND and DRAM is unrelated to the parties' joint-development project. Netlist's proffered interpretation ignores the text, structure, and purpose of the JDLA, and would produce commercially unreasonable results.

### a. Netlist improperly relies on a negative inference lacking any logical basis.

Netlist argues that since section 6.1 requires Netlist to supply an "NVDIMM-P controller," 4-ER-714 (§6.1), while section 6.2 requires Samsung to supply "NAND and DRAM products," without reference to "NVDIMM-P," *id.* (§6.2), section 6.2 must be read to require Samsung to supply NAND and DRAM unrelated to the NVDIMM-P joint-development project. RB11-13, 17-18. But the negative-inference canon—*expressio unius est exclusio alterius* (i.e., the expression of one thing is the

exclusion of the other)—"applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (quotation omitted); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (the "force of any negative implication … depends on context"). Here, the negative inference Netlist asks the Court draw is not "sensible," so the canon does not apply.

Section 6.1 mentions "NVDIMM-P" because it requires Netlist to supply a component unique to NVDIMM-P—namely, an "NVDIMM-P controller." OB28. According to Netlist, Samsung seeks to "import[] NVIDIMM-P product language" from section 6.1 into section 6.2. RB12. But Samsung does not seek to do any such thing, as *there is no such thing as "NVDIMM-P NAND" or "NVDIMM-P DRAM."* NAND and DRAM are generic types of memory that can be used for many products and, in the context of the JDLA, are components of the NVDIMM-P product the parties agreed to jointly develop. OB28-30. It would have thus made no sense for the parties to refer to "NVDIMM-P NAND" or "NVDIMM-P DRAM" in section 6.2. Sections 6.1 and 6.2 thus accurately describe the NVDIMM-P components that the JDLA obligates the parties to supply

3

*for the joint-development project*: an "NVDIMM-P controller" and "NAND and DRAM."

The omission of the term "NVDIMM-P" from section 6.2 thus cannot serve to obligate Samsung to supply Netlist with NAND and DRAM for purposes beyond the joint-development project. In its opening brief, Samsung explained the logical error in Netlist's negative inference. OB28-30. Yet Netlist's brief does not acknowledge, let alone respond to, this glaring defect in its proffered interpretation.

Without this unavailing negative inference, nothing remains of Netlist's argument. Netlist quotes the district court's statement that courts should "be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," RB18, citing a number of cases holding that unambiguous contract language, including by negative implication, must be applied, *see* RB13-15, 17-18. But Samsung is not asking the Court to impliedly read into the JDLA a term the parties neglected to include—and the cases Netlist cites are inapposite—because the negative inference Netlist seeks to draw is entirely unsupported. The JDLA's accurate descriptions of the components for the product the parties agreed to jointly develop could not

4

saddle Samsung with an unbounded obligation to furnish Netlist with NAND and DRAM for any purpose, unrelated to the joint-development project.

> **b.    Read as a whole, the JDLA unambiguously limits section 6.2 to the NVDIMM-P joint-development project.**

Netlist acknowledges that under New York law, contracts must be read as a whole. RB12-13. New York law thus requires the Court to look beyond the text of section 6.2 alone and to read section 6.2 in light of the broader text, structure, and purpose of the JDLA, construing the contract "as a whole" and interpreting section 6.2 "with reference to the whole." *Westmoreland*, 100 N.Y.2d at 358. As Samsung has explained, that analysis unambiguously limits Samsung's supply obligation to the NVDIMM-P joint-development project. OB25-30.

Netlist's brief barely references the JDLA's broader text, structure, or purpose. Indeed, Netlist's only attempt at an argument based on the JDLA's structure is that because sections 7 and 8 of the JDLA—which relate to cross-licensing of patents—are not limited to the NVDIMM-P joint-development project, section 6.2 also need not be limited to that project. RB13.

But Netlist's argument contradicts the JDLA's clear structure and purpose. The JDLA's title itself—the "Joint Development and License Agreement"—makes plain that the parties' intent was twofold: (a) to commit the parties to jointly develop an NVDIMM-P product; and (b) to cross-license certain patents. *E.g.*, OB29-30. Accordingly, each substantive section[1] of the JDLA corresponds to one of these two different purposes. Sections 2 through 6 concern the NVDIMM-P joint-development project, addressing subjects such as the collaborative process, development costs, jointly developed IP, production standards, and component supplies. 4-ER-712-14. In contrast, sections 7 and 8 deal with patent licensing, not the joint-development project. 4-ER-715-16.

The JDLA's text, structure, and purpose show that section 6 establishes the parties' mutual supply obligations *for the NVDIMM-P joint-development project*. But in Netlist's view, section 6 is a hybrid: While Netlist's supply obligation in section 6.1 concerns only the NVDIMM-P

---

[1] Section 1 is a definitions section. 4-ER-709-12. The sections after 8 are not specific to either the joint-development project or patent licensing, but rather concern the entire JDLA. But those sections do not set forth the parties' substantive obligations under the contract, and instead focus on issues such as confidentiality, contract remedies, representations and warranties, and the like. *See* 4-ER-716-20.

6

joint-development project, section 6.2 inexplicably extends beyond that project and requires Samsung to supply Netlist memory on demand, for any purpose. As just shown, however, every other substantive section of the JDLA exclusively concerns *either* the NVDIMM-P joint-development project *or* non-joint-development issues, thus rebutting any suggestion by Netlist that section 6 concerns both.

Indeed, all textual cues in section 6 indicate that both sections 6.1 and 6.2 concern only the joint-development project. Take section 6's title: "Supply of *Components*." 4-ER-714-15 (§6) (emphasis added). In a contract to jointly develop a particular product (like the JDLA), the components to be supplied are those needed for the parties' *jointly developed product*. This understanding is reinforced by Netlist's supply obligation in section 6.1, which Netlist agrees is limited to the NVDIMM-P joint-development project. Sections 6.1 and 6.2 establish parallel obligations: Section 6.1 establishes Netlist's supply obligation for the joint project, and section 6.2 establishes Samsung's corresponding supply obligation for that project. OB30. That parallel structure precludes Netlist's construction of section 6.2, under which the parties' supply obligations would be wildly asymmetric.

Samsung noted all of these points in its opening brief, but Netlist addresses none of them. Netlist does not explain why the parties would have referred to the NAND and DRAM that Samsung was obligated to supply as "components," if Samsung was required to supply DRAM and NAND outside the joint-development project, including for resale by Netlist to third parties. Netlist likewise does not explain why the parties would place an unbounded supply obligation for Samsung side by side with a supply obligation on Netlist's part limited to the joint-development project.

Nor does Netlist explain why the parties would relegate such a commercially important and extraordinary obligation—to allegedly supply unlimited memory for any purpose in a supply-constrained market—to an unremarkable sub-section, buried in the middle of the contract, that governs supply obligations for "components" of a joint-development project. Indeed, the issue of memory supply was so important to Netlist that Netlist mentioned it prominently in its Form 10-K SEC filing. *See infra* at 17.

8

The closest Netlist comes to a response is its remark that "the title of section 6 is merely 'Supply of Components,'" RB16—which is no response at all. Indeed, as discussed above, *see supra* at 7, use of the word "Components" in the title of Section 6 confirms that Samsung was obligated to supply components of *a particular product*—i.e., the NVDIMM-P product the parties agreed to jointly develop. For all these reasons, when read as a whole, the JDLA cannot reasonably be read as Netlist argues.

### c. Netlist's construction of section 6.2 conflicts with what ordinary businesspeople would reasonably expect.

Finally, Netlist's reading of section 6.2 would produce "commercially unreasonable" results, an outcome highly disfavored under New York law. *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012). To be clear, Samsung is not arguing, as Netlist suggests, that "judicial insertion of limiting language into § 6.2 makes 'commercial sense.'" RB18. As shown above, it would have made no sense for the parties to insert the term "NVDIMM-P" into section 6.2. Rather, Samsung's point is that New York law requires that the "reasonable expectation and purpose of the ordinary business[person] when making an ordinary business

9

contract serve as the guideposts" to construing a contract. *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 340 (1998) (quotation omitted).

Netlist does not appear to disagree but instead contends that this canon cannot override "a clear, unambiguous term" of the contract. RB20. But the only supposedly "clear, unambiguous" language Netlist cites is based on its unsupported negative-implication argument. *Id.*

The Court should thus apply the "well settled principle that a contract should not be interpreted to produce … commercially unreasonable" results. *Cole*, 99 A.D.3d at 596. And Netlist's reading of section 6.2 is just that—commercially unreasonable. As Samsung has explained, *e.g.*, OB26-27, the market for NAND and DRAM is substantially supply constrained. That means that Samsung often receives more requests for memory than it can fill with available supply. OB5-6. If the JDLA indeed obligated Samsung to supply Netlist with all the memory Netlist sought, on demand, for any purpose, Samsung would risk having insufficient NAND and DRAM to supply its other customers, thus jeopardizing those customer relationships.

Indeed, under Netlist's reading, section 6.2 would obligate Samsung to fulfill Netlist's requests even when the purpose of Netlist's purchase was resale to third parties—*including third parties that Samsung might otherwise have been able to directly supply*. Netlist makes no effort to explain why any reasonable businessperson would voluntarily agree to an arrangement so inconsistent with the dynamics of the relevant market.

Such an unbounded, asymmetric, commercially unreasonable supply obligation cannot be read into a contract absent clear language that this was the parties' intent. Here, there is no such language. To the contrary, the JDLA's text, structure, and purpose *foreclose* Netlist's reading.

      2.    *Even If Section 6.2 Were Ambiguous, The Extrinsic Evidence Overwhelmingly Supports Samsung's Reading.*

Further, all the relevant extrinsic evidence favors Samsung's reading, meaning that even if the contract were ambiguous, those ambiguities would have to be resolved for Samsung. OB30-35. Netlist's response only confirms this point.

      a.    **Negotiation history and MOU**

Under New York law, "evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of a

[contract]" is the most important type of extrinsic evidence for resolving a contractual ambiguity. *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (1975). ███████████████████████

████████████████████████████████████████████████

█████████████████████████████████ The MOU leaves no doubt that the parties intended to limit Samsung's supply obligation to the NVDIMM-P joint-development project.  OB31-32.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ That paragraph first set forth Netlist's obligation to supply Samsung with NVDIMM-P controllers.  2-ER-187; *see also* 4-SER-695.  The paragraph then stated: "Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM."  2-ER-187.

The MOU's use of the phrase "Raw Materials" in describing Samsung's supply obligation—██████████████████████████████████

████████████████████████████—plainly shows that Samsung's supply obligation was intended to be limited to the NVDIMM-P joint-development project. In fact, even Netlist's own CEO, Chuck Hong, *admitted* at his deposition that "raw materials" in the MOU were *limited to the NVDIMM-P product*, "if it ever became commercialized" (which never occurred). 3-ER-381; *see* OB31-32. Notably, the "raw materials" in the MOU with respect to Samsung's supply obligation became the "components" Samsung was required to supply in the JDLA. Importantly, both "raw materials" and "components" clearly denote parts of a larger thing—here, the NVDIMM-P product the parties agreed to jointly develop.

Netlist does not even try to rebut any of this, including its CEO's dispositive concession. Instead, Netlist first argues that the Court should ignore the MOU because it was a non-binding term sheet and the JDLA's merger clause makes clear that the JDLA supersedes all prior agreements. RB24-25. But Samsung is not contending that the MOU is the operative contract or that it adds additional provisions to the JDLA. Samsung merely posits that if the Court finds the JDLA ambiguous, then the Court must consider extrinsic evidence—including "[a]greements and

negotiations prior to or contemporaneous with the adoption of" the JDLA. Restatement (Second) of Contracts § 214(c) (1981); *see also 67 Wall St. Co.*, 37 N.Y.2d at 248-49. The MOU is indisputably relevant extrinsic evidence, as it reflects the parties' agreement just before the JDLA was adopted, and provides compelling evidence that the parties intended to limit Samsung's supply obligation to the NVDIMM-P joint-development project.

Netlist next argues that the Court need not consider the MOU because the parties changed the scope of their deal between the September 2015 MOU and the November 2015 JDLA. RB24. But the only "evidence" Netlist offers of any purported change is that the JDLA contains language requiring Samsung to supply the required memory components "on Netlist's request." RB24. That language, however, does not address the only issue at hand—whether Samsung's supply obligation extends beyond the NVDIMM-P joint-development project. Rather, the requirement to furnish DRAM and NAND "on Netlist's request" simply reflects the fact that Samsung had a supply obligation to Netlist—a fact neither party disputes.

14

Further, the relevant evidence undermines Netlist's contention about an altered deal.  But according to Netlist, Samsung's supply obligation expanded dramatically between September and November 2015, ██████████████████████████████. However, Netlist's own CEO refuted that contention, agreeing at his deposition that the "goal of [the] MOU [was] to memorialize alignment on high-level, important points." 3-ER-383. And, of course, there is no evidence—no correspondence, no draft agreements, nothing—reflecting the momentous change Netlist now advances.

The principal extrinsic evidence on which Netlist relies likewise confirms that *Netlist itself* understood that the supply obligations in the MOU and JDLA are *identical*. Netlist points to an October 14, 2015 email it sent objecting to Samsung's initial draft of the JDLA. RB21-22. Samsung's initial draft stated that Samsung would supply NAND and DRAM "on Netlist's request" at a competitive price but did not require Netlist to purchase, nor Samsung to supply, any memory. *Id.*; 3-ER-412 (¶19). In

15

response, Netlist asked Samsung to strike the language stating that Netlist was not required to purchase (and Samsung not required to supply) memory, because "Samsung clearly agreed [in the MOU] to provide Netlist with NAND and DRAM products." RB21 (quoting 3-ER-414-15 (¶21)). Samsung agreed to the change, and this language was not included in the JDLA. This extrinsic evidence simply does not speak to whether the scope of Samsung's supply obligation extended beyond the NVDIMM-P joint-development project.

Netlist's October 14, 2015 email is crucial evidence, though, because it directly contradicts Netlist's argument that the JDLA fundamentally expanded Samsung's supply obligation from that set forth in the MOU. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Netlist objected that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Samsung's draft JDLA "Conflict[ed] with MOU." 2-ER-280 (¶35); *see also* 2-FER-56-58. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Netlist explained that its requested change "*returned the language to reflect what was agreed to in the MOU.*" 2-ER-280 (¶35) (emphasis added); *see also* 2-FER-57. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Netlist fails to provide this crucial context,

16

while at the same time contending that the parties' ultimate deal some-how strayed dramatically from the MOU.

Netlist's misdirection aside, even Netlist does not dispute that Samsung's supply obligation under the MOU was limited to the NVDIMM-P joint-development project. Thus, this evidence of "negotiations and agreements made prior to or contemporaneous with the execution of" the JDLA, *67 Wall St. Co.*, 37 N.Y.2d at 248-49, directly refutes Netlist's proffered interpretation of section 6.2 of the JDLA.

### b. Netlist's contemporaneous understanding

Netlist's 2015 Form 10-K, filed with the SEC a few months after the parties signed the JDLA, declared that Netlist had "no long-term … supply contracts" for DRAM and NAND. 4-ER-606. If Netlist truly believed that under the JDLA, Samsung owed it DRAM and NAND on demand—for any purpose—Netlist would never have made such a statement to its investors.

Netlist responds by quoting a different passage in the same SEC filing, which notes that the JDLA "contractually commit[s] Samsung to supply NAND flash and DRAM products to [Netlist] on [Netlist's] request

at competitive prices." RB25 (quoting 3-ER-435 (¶59)). But that state-
ment also does not address whether Samsung's supply obligation extends
beyond the NVDIMM-P joint-development project—the only issue at
hand. However, Netlist's representation to its investors that it lacked
any long-term supply contract for DRAM and NAND *does* address the
issue at hand, and confirms Netlist's contemporaneous understanding
that the JDLA did not create the open-ended supply obligation Netlist
now advances.

Further, Netlist's Form 10-K elsewhere described Samsung's sup-
ply obligation under the JDLA as providing Netlist with "access to *raw
materials* (DRAM and NAND flash) at competitive prices." 4-ER-627
(emphasis added). As noted earlier, "raw materials" is the language the
parties used in the MOU, which language Netlist's CEO admitted re-
ferred to raw materials *for the NVDIMM-P joint-development project. See
supra* at 12-13. It would make no sense for Netlist to describe an obliga-
tion to supply DRAM and NAND for any purpose, including resale to
third parties, as an obligation to supply "raw materials." The 10-K's rep-
resentation that the JDLA "contractually commit[s]" Samsung to supply
NAND and DRAM, but that this commitment is limited to providing "raw

materials" for the NVDIMM-P joint-development project, is thus fully consistent with the 10-K's admission that Netlist at the time had "no long-term … supply contracts" for DRAM and NAND beyond the NVDIMM-P joint-development project. 4-ER-606.

Netlist also asserts that after the JDLA was signed, it "repeatedly discussed Samsung's mandatory supply obligation with financial analysts and investors." RB26 (citing 2-SER-436-39). But by Netlist's own admission, those statements only show that Netlist "had a supply contract with Samsung," 2-SER-437—a point no one disputes. To the extent Netlist was telling its investors that it had purchased NAND and DRAM from Samsung "under the terms of the JDLA," *e.g.*, 2-SER-438, that is incorrect—Netlist's purchases of memory from Samsung after the JDLA was executed were made by separate purchase orders unrelated to the JDLA, as the parties' NVDIMM-P joint-development project was never commercialized. *See infra* at 20-21.

In any event, the statements Netlist cites were made well after the JDLA was signed, *see* 2-SER-436-39, making them "'unilateral expression[s] of one party's postcontractual subjective understanding of the

19

terms of the agreement,'" and thus "'not probative as an aid to the interpretation of the contract.'" *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006) (quoting *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 208 n.10 (2d Cir. 2005)); *accord Murray Walter, Inc. v. Sarkisian Bros., Inc.*, 183 A.D.2d 140, 146 (N.Y. App. Div. 1992).

### c. Course of conduct

The parties' course of conduct after the JDLA was executed also confirms the parties' understanding that Samsung did not have an unlimited supply obligation with respect to NAND and DRAM memory. *See* OB33-34.

Netlist points out that the volume of memory products Samsung sold to Netlist increased substantially between 2015 and 2017. RB23. But, as referenced above, Netlist omits that those sales were made pursuant to separate agreements unrelated to the JDLA: In particular, Netlist would request NAND and DRAM from Samsung through separate purchase orders stating that they represented "*the entire agreement between [the] parties with respect to the subject matter*," and Samsung would fulfill some—but not all—of those orders. 2-ER-283-285 (¶¶46-53,

20

57) (emphasis added); *see also* 1-FER-4-53. This course of conduct is irreconcilable with Netlist's current interpretation of the JDLA. OB33. Netlist offers no response.

Netlist's proposal to Samsung in 2017 for a new supply agreement for NAND and DRAM, styled as an "Official-Distributor Partnership Agreement," also contradicts Netlist's argument that it had a right under the JDLA to NAND and DRAM independent of the NVDIMM-P joint-development project. 2-ER-212 (¶45); *see* OB34. Netlist would have had no reason to propose such a new supply agreement if it believed that the JDLA already entitled it to NAND and DRAM on demand. Again, no response from Netlist.

Finally, Netlist never raised the JDLA or otherwise objected when Samsung did not fulfill Netlist's memory orders. *See* OB34. For example, in April 2016, a Netlist employee sent Samsung an email, saying, "I know it's insane but want to … try our luck" at purchasing more NAND. 3-ER-447 (¶71). Netlist would not have called its request "insane" if it believed it had a right to on-demand memory supply under the JDLA. Instead, Netlist's request surely would have referenced its claimed right to on-

21

demand memory supply under the JDLA. Netlist did not do so because it had no such right.

### d. Samsung's after-the-fact internal communications

Netlist next relies on "internal communications" in 2018 from Samsung, which Netlist erroneously claims show that Samsung believed its supply obligations extended beyond the NVDIMM-P joint-development project. Netlist argues that those communications show that Samsung "had 'an obligation to supply NAND/DRAM' because '[p]ursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist.'" RB23. This mischaracterization ignores the facts.

What Netlist implies was one communication was actually two emails, several weeks apart. The first says that "[p]ursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist." 3-ER-423 (¶38). That email says nothing about whether that obligation extended beyond the NVDIMM-P joint-development project. And the email's recipient—the director of Samsung's Memory Sales Team—testified to his understanding that *supply under the JDLA was limited to NVDIMM-P. Id.*

22

The second email stated that "there is an obligation to supply NAND/DRAM at a competitive price if [Netlist] makes a request." 3-ER-424 (¶39). But Netlist fails to mention that a Samsung employee responded to that email the same day and clarified that Samsung's obligation in this regard was "to provide NAND/DRAM *for development*." *Id.* (emphasis added). Thus, the "internal communications" relied on by Netlist actually show that Samsung employees in 2018 understood the JDLA the same way Samsung reads it now.

### e. Extrinsic evidence of the supply obligation's purpose

Netlist also relies on a self-serving, after-the-fact 2021 affidavit from its CEO, Mr. Hong, claiming it shows Samsung agreed to an unbounded supply obligation in consideration for a patent license from Netlist. According to Netlist, the "exchange of a supply obligation in return for a patent license was the centerpiece of the JDLA." RB43. That assertion was invented for this litigation and contradicts the relevant pre-litigation extrinsic evidence.

Prepared more than five years after Netlist signed the JDLA, the affidavit asserts that Samsung committed "to supply NAND and DRAM to Netlist as consideration for the agreement we entered into," 3-SER-

23

579 (¶4), and that "Netlist was willing to make a number of important concessions to Samsung in exchange for Samsung's contractual commitment to provide supply" of NAND and DRAM, most notably "provid[ing] Samsung with a license to its Patents," 3-SER-580 (¶5).

Mr. Hong's affidavit is legally defective for two reasons. First, the affidavit is not probative of the JDLA's meaning because the affidavit is a "unilateral expression" of Netlist's "postcontractual subjective understanding" of the JDLA's terms. *Faulkner*, 452 F. Supp. 2d at 379; *see supra* at 19-20. Second, the plainly self-serving affidavit offers no actual facts to support its conclusory assertions. A "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997).

Mr. Hong's *post hoc* story also contradicts the objective extrinsic evidence, to wit, the parties' negotiation history and Mr. Hong's own deposition testimony. Netlist correctly notes that, in April 2015, it proposed that Samsung pay $85 million in exchange for a patent license. RB43. But Netlist fails to mention the critical fact that Samsung *rejected* that

24

proposal and the ultimate deal struck between the parties looks nothing like the initial deal Netlist proposed. Needless to say, Netlist can propose what it wants—what matters is what the parties *actually agreed to*. It is undisputed that, as of September 2015 when the parties executed the MOU, the parties agreed that the supply obligations were limited to the NVDIMM-P joint-development project, as Mr. Hong himself conceded at his deposition. *See supra* at 13.

The deal that Netlist now argues was the "centerpiece" of the parties' agreement—on-demand memory supply in exchange for a patent license—was thus not reflected in the MOU at all.  3-ER-383; *see supra* at 15.

In fact, the parties included the section 6.2 supply obligation in the JDLA *not* in exchange for a patent license, but as a way of ensuring that the NVDIMM-P joint-development project would have the necessary

memory supply if the project proved successful. Indeed, Mr. Hong confirmed at his deposition that "Netlist's hope was that this product [i.e., the NVDIMM-P product the parties agreed to develop] would be a significant product for Netlist someday," and that if it did become a significant product, "Netlist would need to have chips available *for that product*." 3-ER-373 (emphasis added). Section 6.2 thus ensures that memory chips would be available if the parties' joint-development project became a success.

This simple explanation accords with the JDLA's structure and purpose, the reasonable commercial expectations of the parties, and the parties' negotiation history and course of conduct, all of which demonstrate that Samsung's supply obligation under section 6.2 is limited to the NVDIMM-P joint-development project. Accordingly, the district court should have granted summary judgment for Samsung on Netlist's section 6.2 claim; its contrary judgment should be reversed.

3. *If The Court Concludes That The JDLA Is Ambiguous And That The Extrinsic Evidence Does Not Resolve The Ambiguity As A Matter Of Law, It Should Remand For Trial.*

If the Court concludes that the JDLA is ambiguous and that extrinsic evidence does not resolve the ambiguity, the proper remedy is remand for trial. OB35 n.2.

Netlist contends that it is entitled to judgment even if the contract is ambiguous because any ambiguity should be resolved in its favor under the doctrine of *contra proferentem*—i.e., the doctrine that ambiguous contractual provisions should be construed against the drafter. That is wrong for two reasons.

First, *contra proferentem* does not apply to contracts negotiated by both parties, as is the case here. *See, e.g.*, *Am. Prop. Consultants, Ltd. v. Zamias Servs., Inc.*, 294 A.D.2d 217, 217 (N.Y. App. Div. 2002); *Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship*, 2 A.D.3d 331, 331 (N.Y. App. Div. 2003).

Second, even if *contra proferentem* applied, New York "courts should not resort to *contra proferentem* until after consideration of extrinsic evidence to determine the parties' intent." *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.,* 432 F.3d 127, 142 (2d Cir. 2005) (quotation omitted); *accord Fairchild v Genesee Patrons Coop. Ins. Co.*, 238 A.D.2d

27

841, 842 (N.Y. App. Div. 1997). Here, the extrinsic evidence resolves any ambiguity in Samsung's favor for the reasons explained. But if the Court disagrees and finds the extrinsic evidence materially disputed, then a jury must consider the extrinsic evidence and resolve the ambiguity. *See, e.g.*, *Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172 (1973). The proper remedy in such circumstances is a remand for trial.

### B. The Jury's Finding That No Damage Resulted From Any Violation of Section 6.2 Independently Requires Judgment for Samsung.

Under New York law, "[f]ailure to prove the essential element of damages is fatal to a cause of action for breach of contract." *Proper v. State Farm Mut. Auto. Ins. Co.*, 63 A.D.3d 1486, 1487 (N.Y. App. Div. 2009); *see* OB36-37 & n.3. The jury's finding that Netlist failed to prove this essential element independently requires judgment for Samsung on Netlist's section 6.2 claim. OB38.

Contrary to Netlist's contention (RB31), the New York appellate court cases Samsung cites involve a failure to prove damages, not a failure to prove breach. OB36-37. In *Proper*, for instance, the court—without even discussing the breach element—held that "[b]ecause plaintiffs failed to support their claim with admissible evidence that they suffered

damages, [the] Supreme Court properly dismissed the complaint." 63 A.D.3d at 1487. Samsung's other cited cases are in accord. OB36-38. To the extent these authorities state that the plaintiff had failed to "ma[k]e a prima facie case for breach of contract," they are referring not to the breach *element*, but instead to the "breach of contract cause of action"—and they all hold that the "failure to prove damages is … fatal to [that] action." *Fellion v. Darling*, 14 A.D.3d 904, 906-07 (N.Y. App. Div. 2005).

It does not matter whether the plaintiffs in those cases sought nominal damages. RB31, 32 n.5. Because a plaintiff must prove damages to prevail on a breach of contract cause of action, a plaintiff is not entitled to judgment at all, let alone nominal damages, when it fails (as Netlist failed here) to prove it suffered *any* damages as a result of the breach. If, as Netlist proposes, a plaintiff who suffered no damages could establish a viable breach-of-contract claim and recover nominal damages, then damages would not be an "*essential* element" of "a cause of action for breach of contract" under New York law. *Proper*, 63 A.D.3d at 1487 (emphasis added).

But damages *is* an essential element under New York law, and New York's intermediate appellate courts hold that failure to prove damages

29

resulting from a contract breach defeats a breach-of-contract claim. Where "there is relevant precedent from the state's intermediate appellate court, [a] federal court must follow" that precedent absent "convincing evidence that the state's supreme court likely would not follow it." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co.*, 851 F.3d 976, 982 (9th Cir. 2017) (quotation omitted). Here, there is no reason to believe that the New York Court of Appeals would deviate from this precedent.

To the contrary, the position held by New York appellate courts—that damages is an essential element of a breach-of-contract claim—derives directly from Court of Appeals precedent. The Court of Appeals has distinguished between two types of cases: (i) those where a contract breach has caused no "reasonably certain" damages at all; and (ii) cases where "it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount." *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886). In the first type, damages cannot be recovered "because they cannot be proved," and the action fails. *Id.* In the second, nominal damages can be recovered because "the amount of damage which [the defendant] has caused is uncertain." *Id.* This case is of the first type: The jury found that Netlist proved

*no damages at all* from Samsung's violation of section 6.2, so Netlist's claim under that section fails.

The Second Circuit recently explained New York's distinction between failing to prove "the existence or fact—as opposed to the amount— of damages" quite clearly in *Holland Loader Co. v. FLSmidth A/S*, 769 F. App'x 40, 43 (2d Cir. 2019). *See* OB40-41. Netlist responds by arguing that the plaintiff in *Holland Loader* only sought actual and not nominal damages. RB31-32. But that is also true here: Netlist did not ask for nominal damages until it had already lost at trial. OB38 n.4.[2] And Netlist fails to respond to the substance of the Second Circuit's explanation of New York law—that proof of the "existence or fact" of damages is an essential element of a contract claim.

---

[2] Netlist's only response to the argument that it waived or forfeited its nominal-damages claim is that Samsung's authorities do not "appl[y] New York law." RB30 n.4; *see also* OB38 n.4. But whether Netlist procedurally forfeited an issue below "is a question of federal law under the Federal Rules of Civil Procedure." *Taylor v. United States*, 821 F.2d 1428, 1433 (9th Cir. 1987) (analyzing waiver of state-law defense). Netlist forfeited its right to seek nominal damages because it failed to raise nominal damages in the pretrial order, *see* Fed. R. Civ. P. 16(e), and because it failed to request a jury instruction on nominal damages, *see* Fed. R. Civ. P. 51(d). *See* 1-SER-46-47.

31

Netlist rests its contrary position primarily on *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90 (1993), which states in passing that "[n]ominal damages are always available in breach of contract actions," *id.* at 95. Notably, the question in *Kronos* was whether nominal damages are available in *tort* cases (where policy considerations may be different), not contract cases, so this sentence is dicta. Regardless, the sentence in *Kronos* supports nominal damages being available where the fact of damages is certain "and the only uncertainty is as to their amount." *Wakeman*, 101 N.Y. at 209. That is evident from *Kronos*'s citation to Corbin on Contracts, *see* 81 N.Y.2d at 95, which states that "it is not necessary for the plaintiff to prove the *amount* of harm that he has suffered by reason of the defendant's breach of duty. If he makes no such proof, however, the judgment in his favor will be for nominal damages only." 5 Corbin on Contracts § 1001 (1951) (emphasis added).

Unsurprisingly, *Kronos* does not contradict the Court of Appeals' distinction in *Wakeman* between a failure to prove the *existence* of damages and a failure to prove the actual *amount* of damages. Nor does *Kronos* contradict the many Appellate Division and Second Circuit cases

holding that the existence of damages is an essential element of a contract action, most of which were decided after *Kronos*. Netlist's other cases are to the same effect.[3]

Here, the jury found in its answer to question no. 1 of the verdict form that Netlist failed to prove *any* damages as a result of any breach of section 6.2. The jury's finding of no damages negates an essential element of Netlist's contract claim, independently requiring entry of judgment for Samsung.

---

[3] Most of Netlist's cases hold "nominal damages" are "recoverable" because the plaintiff proved the existence of damages, but not the amount of those damages "with the required certainty." *Freund v. Washington Sq. Press*, 34 N.Y.2d 379, 383-84 (1974); *accord Manhattan Savs. Inst. v. Gottfried Baking Co.*, 286 N.Y. 398, 400 (1941); *Hirsch Elec. Co. v. Cmty. Servs.*, Inc., 145 A.D.2d 603, 605 (N.Y. App. Div. 1988); *see also Finley v. Atlantic Transp. Co.*, 220 N.Y. 249, 258 (1917) (holding in tort case that nominal damages are appropriate where the plaintiff proved emotional-distress damages that were not quantifiable). Netlist also cites *Perry v. McMahan*, 164 A.D.3d 1488 (N.Y. App. Div. 2018), which does not itself explain the basis for its conclusion that nominal damages are warranted. But *Perry* incorporates by reference a companion case, *Perry v. McMahan*, 164 A.D.3d 1486 (N.Y. App. Div. 2018), which explains that "resulting damages" is an essential element of a breach of contract action, consistent with all other New York appellate authority described earlier. *See supra* at 28-31. Netlist cites two non-binding federal court decisions and the Restatement (Second) of Contracts, RB30, but those authorities of course do not provide "convincing evidence" that the *New York Court of Appeals* "likely would not follow" New York Appellate Division precedent. *Teleflex*, 851 F.3d at 982.

## II.  Samsung Is Entitled To Judgment On Netlist's Tax-Withholding Claim.

### A.  Samsung Did Not Violate Section 3.1 By Reasonably Withholding Taxes.

The district court also erred in holding that Samsung's reasonable, but ultimately erroneous, withholding of taxes from its $8 million payment to Netlist under section 3.1 constituted a breach of that provision. OB42-45.

Section 3.2 allows Samsung to withhold from its $8 million payment any taxes "required by applicable law."  4-ER-713.  Netlist does not dispute that Samsung's ultimately mistaken withholding was reasonable at the time of the withholding.  Nor could it, as a panel of the Korean tax authority initially agreed with Samsung that, under Korean law, Samsung was required to withhold and pay $1.32 million in taxes on Netlist's behalf.  Netlist nevertheless argues that Samsung breached section 3.1 because a Korean tribunal later overruled that lower panel, finding Korean law did not require the withholding and refunding Netlist the entire $1.32 million payment *with interest*.  RB36-38.

Netlist again fails to respond to Samsung's main textual argument. Section 3.2 allows Samsung to withhold taxes "required by applicable law" and simultaneously recognizes the possibility that those taxes might

34

not be required after all. Section 3.2 requires Samsung to "reasonably cooperate with Netlist in any lawful efforts to claim a … refund … with respect to any … withholding taxes." 4-ER-713. A refund could only be sought after a mistaken withholding, so section 3.2's reference to the potential need "to claim a … refund" expressly contemplates that Samsung may reasonably but mistakenly withhold taxes. OB43-44. Netlist does not attempt to explain how a reasonable but mistaken tax withholding could automatically breach section 3.1 when section 3.2 anticipates exactly this scenario and directs the parties to cooperate to obtain a refund.

Netlist also fails to explain how its construction of section 3.1 is plausibly consistent with the "reasonable expectation and purpose of the ordinary business[person]," which, as explained above, "serve as the guideposts" to construing a contract. *Uribe*, 91 N.Y.2d at 340.[4] Samsung is obligated under section 3.2 to reasonably cooperate with Netlist in seeking a refund of the withheld tax—i.e., to establish that the tax was

---

[4] Netlist spends several pages attempting to factually distinguish *Uribe* (*see supra* Part I.A.1.c) and *Raymond Corp. v. National Union Fire Insurance Co.*, 5 N.Y.3d 157 (2005), RB37-38, but never actually disputes those cases' teaching that contracts should be construed such that they make "common and economic sense," *Raymond Corp.*, 5 N.Y.3d at 165; *see supra* at 10.

not required to be paid. Under Netlist's construction, Samsung thus has an obligation to assist Netlist *in proving that Samsung breached the contract by withholding the tax*. No reasonable businessperson would agree to a contract requiring it to cooperate in proving its own breach. And that is especially so when the consequences of breach—that is, the consequences of a reasonable mistake about the requirements of Korean tax law—could be the termination of an important product-development effort and a valuable patent license.

What a reasonable businessperson would agree to in the case of an erroneous but reasonable tax withholding is to help the counterparty obtain a refund and thus make the counterparty whole—which is exactly what the JDLA requires, and which Netlist no longer disputes Samsung did. OB14 n.1.

Netlist's reading of section 3.1 as a strict-liability obligation to withhold only taxes ultimately upheld by Korean tax authorities is at war with common sense and the JDLA as a whole. Accordingly, the district court should have granted summary judgment to Samsung on Netlist's section 3.1 claim; its contrary judgment should be reversed.

## B. Netlist's Failure To Prove Damages For Any Breach of Section 3.1 Independently Requires Judgment for Samsung.

Even if Samsung did breach section 3.1, Netlist failed to prove that it suffered any compensable damages as a result. S*ee infra* at 66-69. For the reasons explained in Samsung's opening brief, OB36-41, 46, and above, *see supra* Part I.B, Netlist's failure to prove damages resulting from any breach of section 3.1—an essential element of a breach-of-contract claim under New York law—should have meant judgment for Samsung, not nominal damages and judgment for Netlist.

## III. Samsung Is Entitled To Judgment, Or At Least A Trial, On Netlist's Declaratory-Judgment Claim.

Netlist also sought a declaratory judgment that it properly terminated the JDLA because Samsung's alleged breaches of sections 6.2 and 3.1 were material. Netlist does not dispute that if Samsung is entitled to judgment as to the supply-obligation and tax-withholding claims, Samsung is also entitled to judgment as to Netlist's declaratory-judgment claim. OB46-47. The Court thus need go no further, since Samsung is entitled to judgment on those first two claims. *See supra* Parts I&II.

37

But even if Samsung had breached the JDLA, there would at least be a fact dispute about whether any breach was material and, if material, whether Netlist waived its right to terminate the agreement.  OB47-59.

## A.    There Is At Least A Fact Question About Whether Any Breach Was Material.

New York courts apply a multi-factor test to determine whether a contract breach is material.  OB47-50.  Under that test, they consider:

(i) the extent to which the plaintiff lost benefits reasonably expected,

(ii) the extent to which the plaintiff can be compensated,

(iii) whether the breaching party will suffer forfeiture,

(iv) the likelihood that the defendant will cure the default, and

(v) the extent to which the defendant failed to comport with standards of good faith and fair dealing.

*See Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005) (citing Restatement (Second) of Contracts § 241); OB47-48.[5]  The district court recognized as much by citing *Bear,*

_____

[5] *See also Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying Restatement § 241 under New York law). Some courts describe the test in slightly different but materially identical

*Stearns*, and acknowledging that the "question of materiality is generally left to the factfinder." 1-ER-45.[6]

Conceding that materiality under this test is ordinarily a jury question, RB42, 46-47, Netlist argues that this is one of the rare cases where materiality can be decided as a matter of law. Not so.

1. *Whether Any Breach Of Section 6.2 Was Material Is At Least A Triable Fact Question.*

First and foremost, the jury found that Netlist had failed to prove *any* damages resulting from any breach of section 6.2. The absence of damages is directly relevant to several of New York's materiality factors. OB48.

---

terms. *See, e.g.*, *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) ("Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." (citing *Hadden v. Consol. Edison Co. of N.Y., Inc.*, 34 N.Y.2d 88, 96 n.9 (1974))).

[6] Netlist suggests that New York's multi-factor materiality test was "newly" created by Samsung, RB46, but, as noted above, the district court itself acknowledged the multi-factor materiality test, and Netlist does not dispute it controls here.

Glossing over the jury's finding, Netlist argues that breach is automatically material "[w]here a party fails to deliver on the 'primary consideration' promised to its counterparty." RB45 (quotation omitted). Netlist again leans on its invented claim that the "primary benefit promised to Netlist under the JDLA was Samsung's mandatory supply obligation" because the "exchange of [that] supply obligation in return for a patent license was the centerpiece of the JDLA." RB43.

That argument is factually and legally wrong. Factually, the parties' actual negotiating history contradicts Netlist's suggestion that a supply obligation beyond the NVDIMM-P joint-development project was the central consideration for Netlist's patent license, as already explained. *See supra* Part I.A.2.e. At the very least, this supposed centrality is factually disputed. And legally, Netlist's argument fails because the relevant "question is whether *the breach is material*, not whether there was *a breach of a material term*." *Reyelt v. Danzell*, 533 F.3d 28, 32 (1st Cir. 2008) (emphasis added). A breach of even a very important term can be immaterial; whether the breach is material depends on New York's multi-factor test.

40

In Netlist's cases, the non-breaching party was deprived of the *only* benefit for which it contracted,[7] making the breach unquestionably material. But here, Netlist obtained substantial benefits from Samsung under the JDLA, independent of the supply obligation in section 6.2. These benefits included an $8 million payment, a license to practice Samsung's patents, a valuable investment from Samsung in the form of a $15 million convertible note, 4-ER-709-13; 2-ER-145, and an "important strategic partner" (as Netlist described Samsung in its 2015 Form 10-K, 4-ER-627) in a joint-development project that Netlist hoped would yield a successful product, *see supra* at 26.

In light of these benefits, a jury weighing the various materiality factors—and especially the fact that Netlist failed to prove that it suffered any damages from any breach of section 6.2—could reasonably conclude that any such breach was not material.

---

[7] *See Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 187 (N.Y. App. Div. 2007) (breach material because the breached provision was the "sole consideration for [the non-breaching party]"); *accord Canon Sols. Am., Inc. v. Lucky Games, Inc.*, 2017 WL 1653563, at *4 (S.D.N.Y. May 1, 2017); *Alberts v. CSTV Networks, Inc.*, 96 A.D.3d 447, 447 (N.Y. App. Div. 2012); *Viacom Outdoor, Inc. v. Wixon Jewelers, Inc.*, 906 N.Y.S.2d 776 (Table), at *2-3 (N.Y. Sup. Ct. 2009); *10-12 W. 107th St. HDFC v. Vilma*, 976 N.Y.S.2d 830, 833 (Civ. Ct. 2013).

Netlist also argues that Samsung's purported breach of section 6.2 was material because obtaining memory products was important to Netlist, with Netlist unsuccessfully seeking increased supply from Samsung after 2017. *See, e.g.*, RB44, 48-49 (recounting Netlist's post-2017 requests for DRAM and NAND). But while the deprivation of an important contractual benefit is relevant to materiality, so too is the magnitude of harm to the plaintiff. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (materiality factors include "the absolute and relative magnitude of default" and "the degree to which the injured party has benefitted under the contract"). Here, given *no* resulting damages for any breach of section 6.2, a jury could reasonably conclude that any such breach was not material—especially when Netlist received many other contractual benefits under the JDLA.[8] *See supra* at 41. The district court erred by taking this question away from a jury and finding materiality as a matter of law.

---

[8] The lack of damages, moreover, is not the only relevant factor a jury could consider in finding no material breach here. *See* OB47-50. For example, the jury could consider the fact that Netlist's failure to give timely notice of termination deprived Samsung of the ability to cure. *See infra* at 54. And the jury could consider that finding a material breach would result in forfeiture of Samsung's valuable patent licenses. OB49.

Netlist advances a number of unavailing reasons why this Court should not consider the lack of damages in its materiality analysis.

*First*, Netlist claims that "[m]ateriality does not depend upon the amount of provable money damages, it depends on whether the non-breaching party lost the benefit of its bargain." RB51 (quoting *Doner-Hedrick v. N. Y. Inst. of Tech.*, 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012)). But whether the non-breaching party lost the benefit of its bargain turns on the aforementioned multi-factor analysis, which depends in part on "the absolute and relative magnitude of default," *Process Am., Inc.*, 839 F.3d at 136, the "quantitative character of the default," *Hadden*, 34 N.Y.2d at 96, and "the extent to which the aggrieved party has already received the substantial benefit of the promised performance," *id.* Those are all different ways of saying that the existence and amount of damages matter to materiality. And the jury here found zero damages.

*Second*, Netlist speculates that the jury may have found that Netlist suffered no damages because its damages were "not quantifiable." RB49. That mischaracterizes the jury's verdict, which was that Netlist suffered no damages *at all* resulting from Samsung's purported breach: The court first asked the jury whether Netlist "prove[d] that it suffered

43

damages as a result of Samsung's failure to fulfill Netlist's orders for NAND and DRAM products in breach of Section 6.2," and the jury answered "No." 2-ER-59. The second question on the verdict form asked the amount of damages Netlist suffered, but the jury never reached that question because it found no damages at all.

*Third*, Netlist argues that the parties' agreement to bar consequential damages—which Netlist implies is the reason it was unable to prove any damages—makes it *more* likely that the purported breach is material. RB49-50. The opposite is true: Materiality must be measured in the context of the parties' agreement, and the JDLA expressly precludes consideration of consequential damages. *See Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*, 2018 WL 10579873, at *14 n.12 (S.D.N.Y. Sept. 19, 2018) (refusing to consider consequential damages for purposes of materiality allegations because consequential damages were expressly excluded under the contract).

*Fourth*, Netlist contends that the lack of damages was not in the summary judgment record and thus cannot be considered. RB48-49. That is incorrect: The district court itself explained in its opinion grant-

44

ing Netlist final judgment that the court had "entered summary judgment on the declaratory judgment claim with the understanding that the reasoning would hold *even if Netlist failed to establish compensable damages*." 1-ER-9 (emphasis added). In other words, in granting summary judgment, the district court considered the issue of lack of damages and held that Samsung's breach was material as a matter of law *even if Netlist suffered no compensable damages*. 1-ER-11; *see* OB54-56.[9]

*Fifth*, Netlist contends that Samsung waived the argument that there are triable issues of fact as to whether any breach of section 6.2 was material. RB42, 46-47. That is wrong for several reasons.

The most obvious is that the district court itself considered whether there was a triable fact dispute on materiality. The court cited *Bear,*

---

[9] Netlist argues that the district court had no authority to revise its summary judgment ruling based on the jury's no-damages verdict, which arose post-summary judgment. RB50. Netlist is wrong. District courts have not only the authority, but the obligation, to revise interlocutory summary judgment rulings when "sufficient cause" for revision is shown. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 n.14 (1983). When new facts come to light post-summary judgment, that is "sufficient cause" under Rule 54(b). *See* OB53 (citing cases). Ultimately, though, the Court need not decide this Rule 54(b) issue because on summary judgment the district court considered the possibility that Netlist suffered no damages from Samsung's breaches, but as explained above erroneously found the breaches material as a matter of law.

45

*Stearns* for the applicable standard and explained that materiality is or-dinarily a fact question. 1-ER-45. The court also confirmed that its ma-teriality analysis considered that there might be no damages from the breach. 1-ER-9. The court nevertheless held that Samsung's breach was material as a matter of law because the supply obligation was "an inte-gral part of the parties' agreement." 1-ER-45. That ruling squarely pre-sents the issue for this Court's review. *See, e.g., Comcast of Sacramento I, LLC v. Sacramento Metro. Cable Television Comm'n*, 923 F.3d 1163, 1168-69 (9th Cir. 2019) (finding issue not waived because it "was raised and addressed by the district court sua sponte"); *United States v. Her-nandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003) (an appellant "may challenge [a] ruling on appeal on the ground addressed by the dis-trict court even if he failed to raise the issue in district court").

Further, contrary to Netlist's contention, *e.g.,* RB41, Samsung *did* argue at summary judgment that there was "no material breach of" sec-tion 6.2. 3-SER-537. "Once a federal claim is properly presented, a party can make *any* argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992) (emphasis added); *see also United States v.*

*Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) ("[I]t is claims that are deemed waived or forfeited, not arguments."). Because Samsung argued that there was no material breach, Samsung is entitled to make additional arguments in support of that basic contention on appeal.

If there were any doubt, this Court also has discretion to reach issues "when the issue presented is purely one of law and … the pertinent record has been fully developed." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010). The question here is whether the district court correctly held that Samsung's purported breach of section 6.2 was material *as a matter of law*, which is a legal question that this Court at a minimum has discretion to consider.

### 2. *Whether Any Breach Of Section 3.1 Was Material Is At Least A Triable Fact Question.*

There is likewise at least a fact question about whether any alleged breach of section 3.1 was material. There is no question that Netlist was made whole with interest on the wrongly withheld taxes, so Netlist was not deprived of any benefit it reasonably expected and was adequately compensated for any deprivation. *See Bear, Stearns*, 361 F. Supp. 2d at 296. And Netlist failed to prove that it suffered any compensable harm from any breach of section 3.1. *See infra* at 66-69. Both the "absolute

Case: 22-55209, 10/06/2022, ID: 12557988, DktEntry: 35, Page 59 of 84


and relative magnitude of default" were thus zero, *Process Am., Inc.*, 839 F.3d at 136, as was any breach's "effect on the contract's purpose," *id.*

Beyond the lack of damages, several factors New York juries use to gauge materiality weigh against a finding of materiality here. Whether a breach is material turns in part on whether it was willful, *see id.*; *Bear, Stearns*, 361 F. Supp. 2d at 296, and Netlist does not contend that any breach was willful. And the harsh consequences of a materiality finding—termination of the JDLA and forfeiture of all of Samsung's rights under the contract, including its valuable patent license—further weigh against any such finding. *See Bear, Stearns*, 361 F. Supp. 2d at 296; OB50-51. There is thus at least a triable fact question about whether Samsung's breach of section 3.1 was material under New York's multi-factor test.

Netlist's main response is that "[u]nder New York law, the relevant time to measure materiality is when the breach occurred." RB53. That is wrong: As Samsung explained in its opening brief, several of the materiality factors New York courts apply—such as whether the breach was cured or resulted in damages—can only be determined *after* the breach. OB52-53.

Netlist exclusively relies on *KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508 (S.D.N.Y. 2020), but *KLS* recognizes New York's multi-factor materiality test, *id.* at 535, which forecloses any bright-line rule limiting the materiality analysis to the time of the breach. Further, *KLS* involved a breach of a unique affirmative covenant to *timely* pay taxes—what was important under the contract there was not just payment but *timely* payment. *Id.* at 545. For that provision, it may have made sense to determine materiality at the time of the breach because breach of a timely payment covenant is inherently incurable. But neither *KLS* nor any other New York authority holds that materiality cannot consider post-breach events. On the contrary, New York's materiality test expressly accounts for such events.

Netlist also argues that it is "axiomatic that failure to pay is a material breach of contract." RB53 (citing 1-ER-45). But that would make even a mistaken but good-faith and quickly cured failure to pay any portion of an amount owed a material breach. OB52. Netlist does not try to defend that implausible position, and New York precedent makes clear that failure to pay money under a contract is not always a material breach. *See, e.g.*, *Helgar Corp. v. Warner's Features, Inc.*, 222 N.Y. 449

(1918) (delay in $10,000 payment was immaterial breach); *Process Am., LLC*, 839 F.3d at 137 (unilateral withholding of payments required under agreement was non-material breach); *Advanced Water Techs. Inc. v. Amiad U.S.A., Inc.*, 2019 WL 4805330, at *5 (S.D.N.Y. Sept. 30, 2019) (declining to find that withholding of $18,000 due under contract was material as a matter of law).[10]

Of course, failure to pay will be material in some cases, so it is not surprising that Netlist has found a few of them. But those cases are inapposite. Netlist's main case is *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991), in which one party withheld payments and accountings required under a distribution-rights agreement. *Id.* at 649. Those payments were deemed material and allowed termination of the contract in large part because of an explicit provision under which the party's failure to provide an accounting authorized the counterparty to terminate the agreement. *Id.*

---

[10] Netlist attempts to distinguish *Amiad* on the grounds that *Amiad* involved a motion to dismiss, rather than summary judgment. RB48. But if failure to pay is always a material breach, the court would have found at the motion-to-dismiss stage that the party's failure to pay was material. The court found instead that materiality was a question of fact. *See Amiad*, 2019 WL 4805330, at *5.

But *ARP* does not hold that a failure to pay is automatically material, let alone when the breach was not willful; when the non-breaching party recovered the full amount owed, plus interest; and when that party suffered no compensable damages. None of the other cases Netlist cites includes a non-willful breach that resulted in no compensable damages. *See Taub v. Marchesi di Barolo S.p.A.*, 480 F. App'x 643, 645 (2d Cir. 2012); *Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64, 68 (S.D.N.Y. 1990).

There is thus no rule that non-payment is always a material breach. Rather, as with all breaches, New York's multi-factor test is the proper gauge of materiality. *See* OB47-51. Under that test, a reasonable jury could—and almost certainly would—find that Samsung's non-willful, harmless breach of section 3.1 was immaterial. *See id.*; *supra* at 47-48. Therefore, the question of materiality should at the very least have gone to a jury.

### B. The District Court Erred In Rejecting Samsung's Waiver Defense To Netlist's Declaratory-Judgment Claim.

The district court likewise failed to recognize a factual dispute on whether Netlist waived its right to terminate the JDLA by sitting on its

hands and reaping benefits under the agreement for years after Samsung's asserted breaches. OB56-59.

The district court interpreted the JDLA's no-waiver provision to mean that Netlist could indefinitely preserve its right to assert a breach. 1-ER-46. But as Samsung explained, the no-waiver clause's plain language says only that a party's failure to assert a breach of a JDLA provision does not waive the party's right to enforce that provision if there is a *future* breach of the same kind. OB57. The no-waiver provision *does not* allow a party to resurrect a past breach when the party elected not to assert a breach at the time and instead continued to accept the benefits of the agreement for years. *Id.* So here, the no-waiver clause does not allow Netlist to sit on a breach by Samsung, reap the benefits of the contract, and then seek to terminate based on conduct that occurred years prior.

Netlist offers no response and thus concedes the district court's reading of the no-waiver clause was erroneous. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (appellees waive arguments they fail to raise in their answering brief).

Beyond this, a no-waiver clause can itself be waived by a party's conduct. Thus, even if the district court's reading of the no-waiver clause were correct, there would be a triable fact question as to whether Netlist waived the no-waiver clause by failing to assert the alleged breaches—and continuing to reap the benefits of the agreement—for years. Netlist's cases do not suggest otherwise. In *Optima Media Group Ltd. v. Bloomberg L.P.*, 2021 WL 1941878 (S.D.N.Y. May 14, 2021), the district court resolved extensive fact disputes after a nine-day bench trial featuring testimony by 11 witnesses, including on the question of waiver. *Id.* at \*4, \*13-15. If anything, *Optima Media* refutes Netlist's argument that waiver can be decided as a matter of law, and supports Samsung's argument that waiver is a triable jury question.

Netlist also cites *Echostar Satellite L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614 (N.Y. App. Div. 2010), where Disney sued for interest that accrued on the counterparty's untimely payments over the life of their contract. Disney's mere delay in collecting the interest was not an "affirmative action on Disney's part from which one [could] infer that Disney surrendered its contractual right to demand interest." *Id.* at 618. There was also no suggestion that Disney's delay prejudiced Echostar in any way.

53

Here, by contrast, Netlist affirmatively indicated its intent to waive the right to terminate by continuing to reap the benefits of the JDLA for years, while at the same time prejudicing Samsung by failing to give timely notice and depriving Samsung of the ability to cure and prevent termination. OB58-59. New York courts have found waiver despite contractual no-waiver clauses in similar circumstances. *See, e.g.*, *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989) (where party "accepted the benefits under the Contract for over a year after" the alleged breach justifying termination occurred, it waived the right to terminate despite no-waiver provision); *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 285-86 (N.Y. App. Div. 2017) (party that waited to terminate contract based on breach could not invoke no-waiver clause because of prejudice to the counter-party); OB59 (citing cases). A reasonable jury could infer in the circumstances here an intent by Netlist to surrender its contractual right to terminate the agreement, i.e., waive the no-waiver clause.

Netlist contends that the evidence of Netlist's intent to waive "does not rise to the level of certainty provided" in Samsung's cited cases. RB59. But the question is not whether Netlist *did* waive the no-waiver

clause; it is whether there is a triable issue of fact on that question. A reasonable jury could find that Netlist waived the no-waiver clause by waiting years to terminate the JDLA, despite knowing of Samsung's supposed breaches, just as Samsung's opening brief explained. OB58-59. The district court thus erred in rejecting Samsung's waiver defense at summary judgment.

## IV. The District Court Erred In Preventing Samsung From Raising Its Affirmative Defenses.

### A. The District Court Erred In Deeming Samsung's Waiver, Acquiescence, And Estoppel Defenses Waived.

The district court also erred as a matter of law in disposing of Samsung's affirmative defenses even though Netlist never raised them in its summary judgment motion.

As an initial matter, the standard of review for this issue is *de novo*. The question here turns on the proper interpretation of Rule 56(a)—Samsung's position is that this Rule, properly interpreted, precludes judgment for a plaintiff on affirmative defenses if the plaintiff did not move for summary judgment on those defenses. "[A] legal issue that involves the interpretation of the Federal Rules of Civil Procedure" is reviewed *de novo*. *KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 713 (9th Cir. 2020); *accord Merch. v. Corizon Health, Inc.*, 993 F.3d 733, 739 (9th Cir. 2021).

55

Netlist erroneously contends that the abuse-of-discretion standard applies, relying on inapposite cases concerning district courts' discretion to excuse failure to plead affirmative defenses in the answer. *See KST Data*, 980 F.3d at 713 (9th Cir. 2020); *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010). Unlike those cases, the issue here turns on the proper interpretation of Rule 56(a)—a purely legal question reviewed *de novo*.

Netlist is also wrong on the merits. Netlist does not dispute that "claim[s] or defense[s]—or … part of each claim or defense" may be adjudicated at summary judgment without placing *all* claims and defenses in issue. Fed. R. Civ. P. 56(a); *see* RB66. But it argues that its motion put Samsung's affirmative defenses at issue because the motion "squarely raised the issue of liability," RB66, and the court then "determined" Samsung's "liability," RB61, thus foreclosing all affirmative defenses.

Netlist is wrong. The motion did not raise—and the district court did not decide—"the issue of liability." Netlist does not dispute that its summary judgment motion made no mention of Samsung's affirmative defenses. And the "elements [of a claim] *and affirmative defenses* are co-equal components of the jury's liability determination." *United States v.*

*Southwell*, 432 F.3d 1050, 1054-55 (9th Cir. 2005) (emphasis added). The entire function of affirmative defenses is to foreclose liability *even when the plaintiff establishes the elements of its claims*.

Thus, far from foreclosing Samsung's affirmative defenses, the district court's entry of summary judgment on the elements of Netlist's claims only heightened the defenses' importance to the ultimate liability determination. But rather than let Samsung assert those pivotal defenses, the district court enlarged its summary judgment ruling to resolve a suite of issues that Netlist never raised and that were not encompassed by its motion. *See* OB60-61 (citing *Long v. Howard Univ.*, 550 F.3d 21, 43 (D.C. Cir. 2008)). This was error.

Because the district court did not adjudicate Samsung's liability, Netlist's non-binding district court cases finding waiver of affirmative defenses in summary judgment on liability are inapposite. *See Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999) (summary judgment decided "on the issue of 'liability'"); *accord Groves v. Am. Fam. Mut. Ins. Co., S.I.*, 479 F. Supp. 3d 796, 802 (E.D. Wis. Aug. 14, 2020); *Kaffaga v. Steinbeck*, 2017 WL 5989039, at *1 (C.D. Cal. Aug. 25, 2017); *Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*, 2017 WL 3453206, at

*1 (E.D. Cal. Aug. 11, 2017); *Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164, 1167 (S.D. Ind. 1992).

Netlist's cases are also wrong. Three of Netlist's cases rely on *United Mine Workers of America 1974 Pension v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993), for the proposition that "an affirmative defense must be raised in response to a summary judgment motion, or it is waived." *Diversey Lever*, 191 F.3d at 1353; *see also Milo & Gabby LLC v. Amazon.com, Inc.*, 693 F. App'x 879, 884 (Fed. Cir. 2017); *Kaffaga*, 2017 WL 5989039, at *1. But *Pittston* doesn't so hold—the defendant in *Pittston* "waived its defenses from the beginning, having never asserted them in any pleading [such as an answer] in the district court." *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 445 (D.C. Cir. 1994). Netlist's reliance on *Groves* is misplaced for the same reason. *See Groves*, 479 F. Supp. 3d at 802 (noting that defendant did not plead affirmative defenses in answer).

Netlist's remaining two cases—*Pantry* and *Duarte Nursery*—simply conflate summary judgment on the elements of plaintiff's claims with determination of overall liability. *See Pantry*, 796 F. Supp. at 1166-67 (treating summary judgment on contract claim's *elements* as "liability"

58

determination); *Duarte Nursery*, 2017 WL 3453206, at *3 (relying exclusively on *Pantry*). The reasoning in *Pantry*—and *Duarte Nursery*, which follows *Pantry*—is incorrect because, as just explained, the viability of an affirmative defense does not turn on a plaintiff's success in proving the elements of its claim. As one district court correctly explained, the "reasoning of the *Pantry* court is not supported by any provision of the Federal Rules of Civil Procedure nor any case law." *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 829 (S.D. Ohio 2002). This Court should not adopt that flawed reasoning.

Equally inapposite are cases standing for the general proposition that theories "raise[d] but abandon[ed]" at summary judgment are waived. RB62-64 (quoting *USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994)). Samsung did not "raise" then "abandon" its affirmative defenses at summary judgment. Rather, *Netlist* failed to seek summary judgment on Samsung's affirmative defenses, and Samsung quite properly did not respond to issues not raised in the summary judgment briefing.

Netlist's effort to distinguish *Long v. Howard University*—an on-point D.C. Circuit case—demonstrates the weakness of Netlist's position.

*Long* explained that "there is no requirement that a party assert [an affirmative] defense in opposition to a summary-judgment motion in order to assert it at trial." 550 F.3d at 24. That holding squarely forecloses Netlist's argument here. According to Netlist, *Long* is distinguishable because the statute-of-limitations defense at issue "did not defeat liability on its merits, but instead provided a defense because the claim was beyond that set forth in the statute authorizing … recovery." RB66. That makes no sense. A statute of limitations is an affirmative defense that defeats a claim even if the elements of the claim are proven, just as Samsung's affirmative defenses here would defeat Netlist's claims even if Netlist proved the elements of those claims. Under *Long*—and Rule 56(a)—the district court erred by deeming Samsung's affirmative defenses waived.

Finally, Netlist contends that Samsung "strateg[ically]" raised its waiver affirmative defense in its summary judgment briefing, but did not raise its other affirmative defenses. RB65. But Samsung raised its waiver defense with respect to Netlist's declaratory-judgment claim *in its own summary judgment brief* because Samsung sought summary judgment in its favor on this claim. 3-ER-514-15. Samsung did not raise any

of its affirmative defenses to Netlist's first two summary judgment claims because those defenses turned on triable issues of fact, which is presumably why Netlist's motion did not raise them either. The district court therefore erred in keeping Samsung's affirmative defenses from a jury.

## B. The District Court Erred In Precluding Samsung From Raising Its Election-Of-Remedies Defense.

The district court also erroneously barred Samsung from asserting an election-of-remedies defense that was encompassed by the estoppel defense in Samsung's answer. This Court reviews that decision *de novo* because—contrary to Netlist's suggestion, RB68-69—Samsung does not challenge the district court's discretionary decision to deny Samsung leave to amend the answer. Rather, Samsung's challenge is to the court's ruling on Samsung's motion for judgment on the pleadings that Samsung "did not plead election of remedies in its answer." OB62 (quoting ECF 89 at 22). That legal ruling is reviewed *de novo*. *See Doe v. United States*, 419 F.3d 1058, 1061 (9th Cir. 2005).

This Court should reverse that ruling because Samsung pleaded an estoppel defense that encompassed election of remedies. Netlist does not dispute any part of Samsung's argument that election-of-remedies is encompassed within the defense of estoppel, which Samsung indisputably

did plead in its answer. OB62-65. Instead, Netlist contends that Samsung "conce[ded] below that it did not plead an election-of-remedies defense." RB71-72 (emphasis omitted).

But Samsung made no such concession. Samsung sought judgment on the pleadings based on its election-of-remedies defense. 3-SER-664-65. In its opposition, Netlist argued that "Samsung did not plead election of remedies in its answer" and therefore "waived that defense." 3-SER-638. Samsung's reply, far from conceding the point, characterized Netlist's argument as asserting that Samsung "did not plead [election of remedies] *separately*." 3-SER-609 n.2 (emphasis added). That is consistent with the position that Samsung advances now and that Netlist does not contest: Election of remedies is encompassed within, and thus not separate from, the estoppel defense.

Samsung's reply then cited authority for the alternative proposition that the court "may consider the … defense" *even if* it was required to be pleaded separately so long as there was no prejudice to Netlist. *Id.* (emphasis added). But that alternative argument was not a concession. *See Kellerer v. Allied Prop. & Cas. Ins. Co.*, 689 F. App'x 494, 496 (9th Cir.

2017) (raising alternative argument "does not concede" principal argument). And as to Samsung's principal argument that its estoppel defense covered election of remedies, Netlist has no answer. Reversal is thus required to correct this error as well.

## RESPONSE TO NETLIST'S CROSS-APPEAL

Netlist's cross-appeal as to consequential damages with respect to the tax-withholding claim is relevant only if the Court affirms the district court's judgment for Netlist on that claim. Because judgment on that claim should be reversed, *see supra* Part II, the Court need not reach the cross-appeal. If the Court were to reach Netlist's cross-appeal arguments, it should reject them.

## COUNTER-STATEMENT OF THE ISSUES

1. Whether the district court correctly concluded that fees paid by Netlist to PricewaterhouseCoopers ("PwC") in connection with proceedings before the Korean tax authority were consequential damages barred by section 12.5 of the JDLA.

2. If the PwC fees are recoverable, whether Netlist is entitled to prejudgment interest computed (i) from December 10, 2015, the date Samsung withheld the tax, or (ii) from (no earlier than) December 30, 2020, when PwC invoiced Netlist for its fees.

63

## COUNTER-STATEMENT OF FACTS RELATING TO CROSS-APPEAL

Section 12.5 of the JDLA precludes the recovery of consequential damages.  4-ER-719-20 (§12.5).  The only damages Netlist sought in connection with its tax-withholding claim under section 3.1 were the $427,051.60 paid to PwC in connection with the proceedings before the Korean tax authority.  1-SER-106.  Because there was no dispute as to amount, the parties agreed that whether the PwC fees were consequential damages barred by the JDLA was a legal question for the court to decide after trial.  *See* 1-ER-5.

The district court ruled that the PwC fees were consequential damages and therefore unrecoverable under section 12.5, finding that the PwC fees were "collateral to the breach" and "not recoverable as general damages."  1-ER-8.

## SUMMARY OF ARGUMENT ON CROSS-APPEAL

I.  The PwC fees are consequential damages barred by section 12.5. The value of the promised performance was the $1.32 million Samsung withheld in 2015.  The PwC fees were an additional loss incurred in response to Samsung's alleged breach.  They are therefore consequential damages under New York law.

64

II.  To the extent Netlist is entitled to such damages, prejudgment interest should be computed from the date the damages were incurred, not the date of breach.  The relevant New York statute provides that, in breach-of-contract cases, "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, *except that interest upon damages incurred thereafter shall be computed from the date incurred*." N.Y. CPLR § 5001(b) (emphasis added).  Netlist indisputably incurred its damages no earlier than December 30, 2020, the date PwC sent Netlist an invoice for its fees.

## STANDARD OF REVIEW ON CROSS-APPEAL

The district court's legal ruling that the PwC fees were consequential damages is reviewed *de novo*.  *See In re Air Crash Disaster Near Cerritos*, 982 F.2d 1271, 1275 (9th Cir. 1992).

## ARGUMENT ON CROSS-APPEAL

### I.  The Trial Court Correctly Concluded That The PwC Fees Netlist Incurred In Seeking A Tax Refund Are Consequential Damages Precluded By The JDLA.

The PwC fees Netlist seeks are consequential damages barred by section 12.5 of the JDLA.

A plaintiff "is seeking general damages when he tries to recover the value of the very performance promised."  *Schonfeld v. Hilliard*, 218 F.3d

65

164, 175 (2d Cir. 2000) (quotation omitted). The archetypal example of general damages is "money that the breaching party agreed to pay under the contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 805 (2014) (quotation omitted).

By contrast, consequential damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld*, 218 F.3d at 176. Consequential damages are "one step removed from the naked performance promised by the defendant." *PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 374 (S.D.N.Y. 2014); *see also Biotronik*, 22 N.Y.3d at 805 (consequential damages "do not directly flow from the breach" (quotation omitted)).

Here, the "very performance promised," *Schonfeld*, 218 F.3d at 175, is the $1.32 million that Samsung withheld in 2015. But Netlist is not seeking to obtain those funds, since it already obtained them, with interest. Rather, Netlist is seeking *additional costs* in the form of professional fees it voluntarily incurred for services by PwC to assist it in obtaining the refund. Those additional costs are consequential damages because they are "one step removed from the naked performance promised by the

66

defendant"—the withheld $1.32 million. *PNC Bank*, 73 F. Supp. 3d at 374.

*PNC Bank* illustrates the point. There, the plaintiff, a national banking association, sued its mortgage software provider after the software failed to timely deliver legally required mortgage disclosures to mortgage applicants. *Id.* at 365-66. The plaintiff hired an accounting firm to determine the number of late disclosures and calculate a proposed refund amount. *Id.* at 373. The court found that the accounting firm's fees were consequential damages (and barred by a consequential damages waiver, as is the case here), explaining that these fees were not damages for the "value of the very performance promised." *Id.* at 373-74; *see also Am. Railcar Indus., Inc. v. Gyansys, Inc.*, 2017 WL 11501888, at *15-16 (S.D.N.Y. Nov. 14, 2017), *aff'd,* 764 F. App'x 57 (2d Cir. 2019) (consulting fees paid "to assess and remediate" software company's breach were "consequential in nature"); *A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 385-86 (S.D.N.Y. 1996) (characterizing "investigation and litigation expenses" incurred in response to breach as "consequential damages").

Netlist concedes (as it must) that the "value of the very performance promised" was "the remaining $1.32 million in fees unpaid by Samsung." RB81-82. And it agrees that "[a] plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'" RB76 (quoting *Schonfeld*, 218 F.3d at 175); *see also* RB81 (general damages are "the value of the very thing promised"). Netlist attempts to avoid those concessions by arguing that professional fees incurred "to *obtain* 'the value of the very performance promised'" are general damages. RB81 (emphasis added) (quoting *Schonfeld*, 218 F.3d at 175). Not so—as the case Netlist cites itself makes clear, "additional losses (*other than the value of the promised performance*) that are incurred as a result of the defendant's breach" are consequential damages. *Schonfeld*, 218 F.3d at 176 (emphasis added).

Netlist also relies on a line of cases holding that professional fees or other expenses incurred by the plaintiffs were "directly occasioned and made necessary by the breach." *See, e.g.*, RB75-76, 78-79 (citing *Kinney v. Mass. Bonding & Ins. Co.*, 206 N.Y.S. 163, 170 (N.Y. App. Div. 1924), *City of Elmira v. Larry Walter, Inc.*, 546 N.Y.S.2d 183, 185 (N.Y. App. Div. 1989)), *J & J Structures, Inc. v. Callanan Indus., Inc.*, 626 N.Y.S.2d

891, 893 (N.Y. App. Div. 1995), *Aero Garage Corp. v. Hirschfeld*, 586 N.Y.S.2d 611, 612-13 (N.Y. App. Div. 1992), and *Congel v. Malfitano*, 31 N.Y.3d 272, 291-92 (2018)). But the question in each of these cases was whether such expenses were *recoverable* as contract damages. None of the contracts at issue precluded consequential damages—as the JDLA does—and none of the cases addresses the distinction between general and consequential damages.

The district court correctly found that the PwC fees were contrac-tually-barred consequential damages.

## II. Netlist's Contention That It Is Entitled To Prejudgment Interest From The Time Of The Purported Breach Is Contrary To Established New York Precedent.

If the Court were to hold that Samsung breached section 3.1 and that the PwC fees are recoverable general damages, Netlist's prejudg-ment interest properly would be computed from the date the damages were incurred—here, no earlier than December 30, 2020, when PwC in-voiced Netlist for PwC's fees. Netlist's argument that interest should be computed from December 10, 2015, the date of breach, RB84-86—i.e., when Samsung withheld $1.32 million in taxes—is without merit.

Netlist contends that "the appropriate measure is the earliest ascertainable date the cause of action existed, i.e., when Samsung breached [section 3.1] of the JDLA," which Netlist places "no later than December 10, 2015." RB85-86. But the relevant statute says that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, *except that interest upon damages incurred thereafter shall be computed from the date incurred*." N.Y. CPLR § 5001(b) (emphasis added).

Netlist ignores the emphasized portion of section 5001(b), which indisputably applies: When a plaintiff seeks to recover fees it paid as a result of a defendant's conduct, those damages are incurred the date they are paid. *See, e.g.*, *Barnett v. Schwartz*, 47 A.D.3d 197, 208 (N.Y. App. Div. 2007); *Leach v. Bailly*, 57 A.D.3d 1286, 1289 (N.Y. App. Div. 2008). PwC invoiced Netlist for the $427,051.60 in fees on December 30, 2020, 1-FER-2, so Netlist could not have "incurred" any damages earlier. N.Y. CPLR 5001(b).

Netlist's cases do not suggest otherwise. In both cases, the contract damages *were* incurred on the date of the breach. *See Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Associates, P.C.*, 91 N.Y.2d 256, 261-63 (1998); *Spodek v. Park Property Dev. Assocs.*, 96 N.Y.2d 577, 578-79

70

(2001). Netlist, by contrast, seeks fees it voluntarily incurred after the alleged breach, namely, after December 30, 2020.

The point of prejudgment interest is to compensate a plaintiff for interest it could have earned if it had not been deprived of money that it eventually collected in damages. But Netlist did not lose the use of the money it paid PwC until it actually paid PwC. Allowing Netlist to obtain prejudgment interest five years prior to that date would be an unwarranted windfall that this Court should reject.

## CONCLUSION

The judgment below should be reversed, with directions to enter judgment for Samsung.

Respectfully Submitted,

Dated: October 6, 2022

By: /s/ Michael G. Yoder

Anton Metlitsky
Bruce C. Pettig
Kevin J. Koai
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Michael G. Yoder
Marc Feinstein
O'Melveny & Myers LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 22-55209 (L), 22-55247

I am the attorney or self-represented party.

**This brief contains 13,953 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[XX] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　[ ] it is a joint brief submitted by separately represented parties;

　　[ ] a party or parties are filing a single brief in response to multiple briefs; or

　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated:  October 6, 2022　　　　　　　　/s/ Michael G. Yoder

72

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


Dated:  October 6, 2022                    /s/ Michael G. Yoder